McGinnis v. American Home Mortgage, Mr. Lynch. May it please the Court, my name is John Lynch and I represent the appellate Homeward Residential. I wanted to tell the Court I appreciate the opportunity to have oral argument today. I'm mindful that all cases don't get oral argument, so I want to thank the Court for that. We're asking the Court today to reverse the Rule 59 ruling by the District Court and reduce the punitive damages to $250,000 or $500,000 at most. The jury returned a verdict in this case for $500,000 in emotional distress damages, $6,000 in economic loss, and $3 million in punitive damages. We'd ask for the punitives to be lowered based on two reasons. One is that the punitive damages are excessive under the due process clause and the lessons learned from the State Farm case. And secondly, under the Georgia specific intent to harm statute, which it's commonly called, punitive damages are capped at $250,000. I'd like to start with the constitutional due process arguments and I'd like to ask the Court to consider two lessons that were learned by the State Farm case by the U.S. Supreme Court in 2003. The first lesson was, from that case, is that if you have a really large compensatory damage award, the ratio should go closer to one to one. And in this case, we believe, given the facts of this case, and I'm mindful that when the Court's considering punitive damages, it's a heavily fact-specific inquiry based on the facts of that case. We believe, based on the record and the facts of this case, with a $506,000 compensatory damage award, the ratio should be one to one or very close to one to one. The second lesson from State Farm that I'd ask the Court to consider is that when you have a very large compensatory award, and in this case, 98% of it is emotional distress damages, that should be discounted when the Court considers the ratio and the amount of punitive damages. But didn't we, didn't, haven't we said that when the jury separately considers the compensatories from the punitive damages, there's not the risk that would be inherent if it were considering both together? I agree, Judge. I agree. And aren't we bound by that? And I agree you're bound by that. But here, though, if you consider punitive just on the $6,000 economic loss and used a ratio, you wouldn't come anywhere close to $3 million or, frankly, anywhere close to $500,000 or $250,000. Right. But I don't think we can consider it just on the $6,000. That's really my question to you, right? I mean, if we have previously said, and I think we have, that when the jury considers the compensatories separately from the punitives as occurred here, then you don't have the danger of perhaps a conflation or a double counting of what would turn out to be punitive damages. And so if that's the case, don't we have to consider the whole compensatory amount, including the emotional damages, as part of the compensatory damages? I believe you do, but I believe still under State Farm that you discount the emotional distress because there's a punitive element to emotional distress. And the risk when you have that large of an award for emotional distress with that punitive element, I'm not saying it's punitive damages, but there's a punitive element to emotional distress, that has to be taken into account. So there's not a duplication between compensatory and punitives. And we believe, given the facts of this case, and a $500,000 emotional distress award, given the facts of this case, that $3 million, there's certainly a duplication of that emotional distress and deterrence and that punitive element that has to be in every emotional distress award. And that's a reason for the duplication. And we believe under State Farm, given both the large compensatory award and the significant portion of that award, that's emotional distress, that warrants the court, in a de novo review of these punitive damages, to lower the amount from $3 million. I'd like to talk next about the reprehensibility factor in this case. This is different than just a typical wrongful foreclosure escrow balance dispute. First of all, the plaintiff in this case, this was an investment property. This was not the principal residence. This was one of 14 investment properties. Two, the communications between Homeward Residential were all to Adam McGinnis, not even the plaintiff. It was the son. But there's evidence that, I mean, obviously it was, although it was to the son, it was clearly being communicated to the plaintiff here. And there's evidence that she was so distressed by the whole situation, she had projectile vomiting and other kinds of problems. So I'm not sure that gets you anywhere. I mean, she's the owner of the property. He might be managing it, but obviously it's getting the information, whatever it is that your client does or says, is getting to her. And the record in the case, Judge, you're right, is that her son was giving periodic updates to the mother who was living in Florida and not at the property. And again, it wasn't the principal residence. But it's her livelihood. I mean, you know. It was one of 14 properties. But you were doing it at other properties as well. I mean, there were multiple properties where this was occurring. Judge, the record in this case was they said they were having problems on the other properties. There's nothing in the record specifically about what those problems were at all. The other six of the seven? Actually, Judge, it's another 14. Well, I understand. But you were servicing all 14? Yes, Judge. It was all 14? Well, she has 14, but you're right, Judge. It was six of the seven. But they said it on . . . Yes, Judge. So the other six, the evidence in the record was they were having other problems. But none of the specifics were discussed about what the problems were at all. And that, as far as what the problems were or whether they were even the same problem at all, was not in the record. They just said generally they were having other problems. Now, you've got to convince us that Judge Thrash's decision is in error. Judge Royal. Oh, it was Judge Royal? I'm sorry. It was Judge Royal. Yes. And I guess I'm going to turn to specific intent to harm. I just don't believe the reprehensive . . . Homeward never profited at all and had no motive here to gain any money, and Homeward actually lost in the record $15,000 to $30,000. I'd like to turn to the specific intent to harm. Judge Royal looked at the record in this case in the first time, in his first opinion, and said there was no specific intent to harm. In the first opinion, in this case, he looked at the same record that he looked at the second time. So clearly, he was struggling. But he explained that by saying there are two different ways to establish specific intent under the law. And he really only looked at the first way because he was doing it based on your motion, and for whatever reason, he didn't look at the second way. Then when it came back, he said, okay, now I realize I need to look at it under the second way as well and focus on that. And when I focus on that, I realize that there was sufficient evidence where a reasonable jury could return a verdict. So I mean, where is the error in that? The error is he cited the same standard in both cases. Then the second opinion, he did consider the second prong of the standard, and he misapplied that standard in his second opinion. And this is where he misapplied it. He focused on the wrongful act and was there specific intent to harm about if the wrongful act is really bad, you can reasonably infer a specific intent to harm. All the cases under Georgia law, even in the second prong, require that you focus on the harm. There's got to be a specific intent to cause the harm. There's no evidence in this case in the record at all that Homeward was substantially certain that its wrongful actions would cause severe emotional distress. Not at all. The judge, where the judge erred in the second opinion, was considering the wrongful act and not the knowledge and the specific intent to harm Mrs. McGinnis. There is nothing in this record that Homeward Residential knew that by foreclosing on an item, Mrs. McGinnis would suffer severe emotional distress. There's only one letter, and it's 1281 in the record, where Adam McGinnis writes in and says, you're causing undue stress to us. Doesn't mention Mrs. McGinnis at all, and the us could be Adam and his wife, it could be Adam and his sister. And that's the only piece of evidence that imports any knowledge on Homeward Residential that it was causing severe emotional distress. There are some actions that one can undertake that one can reasonably assume and should know will inflict substantial emotional distress. Would you agree with me? I agree, and if that was the test, I would 100%. It's substantially certain and specific intent to harm under Georgia law. Reasonably no or even strongly probable is a no. Substantially certain. You do not agree with me that there are certain acts that a person can take where that person is substantially certain that the acts will result in severe distress. I agree, but that would mean in this case without any knowledge imported to Homeward that every single wrongful foreclosure in the state of Georgia automatically gives you specific intent. I don't agree, and I'll tell you why, and maybe you want to respond to it. In this case, there was a tacit admission of an erroneous calculation and a subsequent decrease in the escrow amount. And then following that, there was a continual failure to justify another increase and an insistence that she pay regardless of the fact that the bank had previously established that there had been an error with no explanation as to why she should have to pay. In addition, there was testimony during the trial that Christopher Dell Bean blindly insisted that Homeward's escrow analysis was correct even though he had not seen the document and had not attempted to calculate the escrow. His position was that plaintiff was required to pay any amount Homeward demanded regardless of whether it appeared reasonable or an error, simply because that is what she agreed to under the note and mortgage. And that's not accurate. I mean, it seems to me that this is different from a foreclosure action where you're sending notices of foreclosure, et cetera, and there's no indication that it's wrong or there is an indication that it's wrong. You investigate it and you find nothing wrongful about it. But here you found it was wrong and continued to contact her and insist that she pay the increase. And I can respond to that in my rebuttal. My time's up. Go ahead. Okay. So, my response on that is exactly why Judge Royal's second opinion was an error. That, Judge, you're right. That is wrongful conduct. That's reckless. And you could argue it's intentional conduct. But that's not the test of specific intent to harm. Specific intent to harm is that you intend for that person to have severe emotional distress. Or in Action Marine, that you intended to pollute that neighborhood. Or in the Rutherford case, that you intended to put that person in jail. You're right, Judge. They were wrong on the escrow. They were wrong in the wrongful foreclosure. But that is not evidence of specific intent to cause the harm. That's specific intent for the wrongful act. Would you agree with me that that activity, regardless of your view of it or how you're characterizing it, that that activity is not activity that occurs in every foreclosure action? And so, if we upheld the punitive damages award here, we would not be setting a precedent that allowed for punitive damages in every foreclosure case? In this case, I think if the court upholds the punitive, it would mean every wrongful foreclosure case because there's no evidence that Homeward had any belief, and this is the standard, that Homeward believed that the consequences of its wrongful act would cause that specific harm. In every wrongful foreclosure, there would be some, just like Judge Royal said, some level of emotional distress. Anyone that lost their house, I think it's common sense. But where is the specific intent to cause Mrs. McGinnis, when it never talked to her, when it never sent one letter that they intended, they were substantially certain that she would have severe emotional distress? There's nothing in the record. It does, intentional infliction of emotional distress, it rose to that level. It rose to the punitive damage level. But specific intent to harm, it would be the first case under Georgia law that we have ever seen that without any knowledge of the harm that would occur, the severe emotional distress, that if she would have wrote in and said, I'm in the hospital, or this is killing me, or they went behind Adam McGinnis' back and went to harass her, they talked to her son, they made a mistake, it was a wrongful foreclosure, it was. And they messed up the escrow balances and didn't have the right to do it. That's what the jury found, and that's what the court found. But our belief, that is not enough for specific intent to harm. You've saved some rebuttal time. Thank you. Hey, please, the Court. My name is Naveen Ramachandrappa, and I represent the plaintiff, Jane McGinnis. I want to start where my opposing counsel started with the constitutional due process question, and I think what is most helpful is to draw the Court's attention to Boggle v. McClure, which is a case cited in our briefs. It's a case involving punitive damages. In that case, the compensatory damage award was $500,000, same as this case. And the important fact is that it was $500,000 all in emotional distress damages. And this Court said, quote, the District Court pointed out that the ratio between the punitive and compensatory damages in this case is in the neighborhood of four to one, a range which the Supreme Court has found to be instructive. Although the librarians received substantial compensatory damages, given the facts of the case, the ratio does not indicate the punitive damage award violates due process. So there's two lessons to take from that. First, not a one-to-one ratio. Even though there were no economic damages, no physical injuries, only emotional distress damages, this Court said it's not one-to-one. Lesson number two is that you include the emotional distress damages. The Court didn't say, we're just going to discount the $500,000 and then do a ratio, which technically would be zero because there were no other damages. You include it. And that makes sense because emotional damages are real damages. But we're higher than four to one in this case, aren't we? We are at 5.9 to one, so yes. But that's still within the range. One, it's a single-digit ratio. It's not double-digit, which is what the Supreme Court has warned against. It's also within the range of other cases this Court has dealt with. Goldsmith v. Bagby Elevator Company, that was a 9.2 to one, so much higher than our case. That was $500,000 in punitive damages and $54,000 in compensatory damages. You're operating here under Georgia law. Correct, Your Honor. So you need to respond to his argument about harm. Sure. So going to the I think everybody agrees that the conduct was reprehensible. Well, I'm glad to hear that. So let's turn then to, as you suggest, the question of specific intent to cause harm. I want to take issue first with an evidentiary question. Opposing counsel was quoting a letter that Adam had sent to Homeward saying that, look at the damage you're causing to us. And opposing counsel said that doesn't mention Jane. It could have been his wife. It does. This is at 89-23, Exhibit 23, quote, your company has caused us undue stress and continue to harass us. Please call Adam or Jane McGinnis. So right there we have the words Jane McGinnis in there. At record 89-18, we have call transcripts. When in the chain of events was the letter dated? When did it occur? The letter that I was just referring to is In the series of events, where is it? So that was December 2009. So in October 2009, Homeward takes over the loans. They immediately increase the escrow by 200%. Adam starts calling, well, they start calling him every day. They started on Thanksgiving of 2009, calling him daily. In December, he sends that letter. This continues for years. Even after the foreclosure, they were still harassing them day by day. If you look at the prior Court of Appeals opinion and the evidence in this case, they say and quite figurative example is that if you stacked all the letters together, it would be five foot high. And so in these phone calls that were recorded, this is a line from one of them. William McGinnis, yes, my name is Adam McGinnis and I've got my mother on the other line. She's going to state her name for you, Mom. I'm going to state your name, Jane, Martha Jane C. McGinnis. And these calls are Kafkaesque. I mean, they have someone, you call them, you say, here's the problem. I've been telling you over and over this is wrong. The person says, oh, you have to speak to a loan specialist. So they transfer them to a loan specialist. Jane's on the line. The loan specialist, you get a recording. And so who do you call next? So they call over and over and if you read these calls, you'll see that they're clearly being harassed. I mean, this is the common experience that everyone has when you're dealing with this type of automated system. And the important part is that the jury heard this evidence. These were audio tapes that were played. They saw and heard the tone, the demeanor, all these things, made it so that the jury knew and can make a finding that Homer knew what was going on and found that they acted with specific intent. And I think the prior court opinion when it was reviewing the intentional affliction of emotional distress said it best. These are all direct quotations from the prior court opinion. Homer almost certainly learned the stakes involved and yet it never looked back. Homer acted with awareness of its error, action in light of a known error. Homer knew that error rendered the acts fundamentally mistaken yet they callously proceeded to foreclosure. This is the evidence in the record and this court when it's reviewing a district court's decision on a motion for a new trial must defer to the district court's observations about courtroom demeanor, about tone, all these issues. Now let me address some of the specific arguments the opposing counsel made about how much specificity do you need to have. Do you need to know that, you know, for example, that Jane McGinnis was involved, was having projectile vomiting symptoms? There's no case that says that you need to have that level of specificity. But the case to say is that . . . He doesn't make that argument. It's obvious the question is the facts are such that a reasonable person would know. Sure, yeah. I'm not talking about negligence. I'm talking about notice. Correct. This is a notice issue. Right. And so in this case, the notice is . . . I mean, what's happening that's communicating the distress. Right. Adam and Jane are telling them you've got this wrong and they just continue to act. They have no justification. We're sort of looking . . . Well, we know they have no justification. We're talking about the response . . . What's the effect of it? Right. Well, he's telling them. Adam is telling them you're causing undue stress and harm to us. He says it right in his letter and they continue to act. And that's all you need for specific intent. And there's one last case that I want to address on this issue. The prior court opinion compared the facts of our case to DeGaulier v. Greentree, which is a Georgia Court of Appeals case. And the prior court said . . . intentionally caused harm. And that's what we have here. We're not going to have a signed confession that says, yeah, I really wanted to take this property from this person. I wanted to harm them. But under the restatement, you don't have to have that. You just have to have knowledge that you're acting wrong. And in the absence of justification, that's a finding the jury can make. What about the distinction that Homeward is drawing that while there may have been this one letter that you sent that indicated that Jane was in distress and she was on the one phone call you referenced that most of this was going from Homeward to Adam. Does that matter? Two responses. One, it doesn't matter. And two, the evidence is more than that. There are many more letters and phone calls. I've just given you those examples. If you look through the trial exhibits, there are multiple calls of what's happening. And then two, the reason why it doesn't matter is that's sufficient evidence. I mean, we're not here all sitting deciding for ourselves whether this is true. We're not even deciding as the district court would do. We're deciding whether the district court properly looked at the evidence and exercised its discretion on that issue. And so, you know, I don't know how opposing counsel can say, well, you've got this evidence, but don't weigh it. Don't look at it. That's something a jury does in the first instance and then the district court does in the second instance. So we've got two levels of deference. You defer to the jury's decision making and you defer to the district court's decision making. And that's enough. I mean, I don't know how many times they had to tell them you're doing something wrong. One should be enough. And they kept going. And they even continued after the foreclosure. And that's an important fact in the level of punitive damages because it shows that their attitude under Adele Bean's testimony, and especially if you watch the video, I mean, he's quite cold about it. We say, well, what if you had asked them, you know, $1,000, 10 times as much as required? He says, it doesn't matter. The borrowers agreed to pay for it. And he says, quote, I don't base my decisions on what the borrower tells me. It's based on what I decide. And a jury is allowed to look at that and say, yeah, they did intend to cause this harm. The last point I want to make is about the procedural argument that we've raised. This is an important part about law, the case that I think helps sum up where we are in this case as well. In the prior appeal, before the prior appeal, the district court applied a legal rule that said, if you don't move under Rule 50A for judgment as a matter of law, you lose the right to move on that issue under Rule 50B and under Rule 59. Yeah, but, I'm sorry to interrupt, but I mean, the prior court did send it back for determination under Rule 59. So, I mean, it seems to me that... That's been decided. Well, here's what I'll say about that, Your Honor. And I certainly... We're not going to go behind the prior panel opinion. Sure. There was a remand and a mandate. Are you familiar with the mandate rule? I am. I am. Okay. So, let's stick with the mandate. Sure. And I'll just say one quick thing about that. I have one question, though. Go ahead. Was there any... There was a jury instruction on the Georgia law, I take. I haven't read the instructions. There was, yes. Okay. Was there any objection to the instruction on punitive damages under Georgia law? There was not, Your Honor. And in fact, Homeward's own instruction is exactly the same instruction that we requested that included the restatement. And this Court in Action Marine v. Continental relied on that. The fact that the defendant themselves didn't object to the instruction. The phrasing, if the standard is, if an actor knows the consequences are substantially certain to result from his act and still goes ahead, he's treated as a law as if he, in fact, desired the result. It's the same thing that this Court relied on in Action Marine v. Continental. No objection. And this was, in fact, Homeward's instruction. In fact, Homeward's instruction even said intent is always a question for the jury to decide. That's all I have unless there's any other... Well, the harm issue was covered, I take it, in the instructions? Yes. Yes, Your Honor. All right. Thank you. Mr. Lynch. Yes, Judge. We...  We agreed with that instruction. That instruction was the instruction under Georgia law for specific intent to harm. And it's the second prong that this case was decided upon that we believe the Court, in the second opinion, misapplied the, or misapplied the standard. And again, what we believe is the fundamental issue is, and this is what the Court held... The jury applied the standard in the first instance. Correct. Correct. And we believe when reviewing the evidence, the Court misapplied the standard. And here's our point. The Court, the jury held... A, B, and I, as if it were the jury. They were reviewing the... Yes. And weighing the evidence. I understand. Okay. This is the issue. I understand. All right. The jury found, and the Court found, knowing an action is wrong and proceeding with conscious indifference. That's what the Eleventh Circuit panel decided... I understand. What was in the instruction about harm? Oh. It was... I haven't read the instruction. Okay. What did it say about harm? The instruction, got right here, specific intent to harm is where the actor believes the consequences of his act are substantially certain to result from it. And what happened here is the Court, in the first opinion, looked and saw that there was no evidence that homework intended to cause that severe emotional distress. What the judge, when we believe it misapplied the standard, looked at the knowledge of the wrongful act and not the intent to cause the specific harm. In other words, your argument is that the judge was stuck with his first observation about harm. Yes. We believe Judge Royal got it right the first time. And in the second opinion, he looked at the wrongful act and not the specific consequence. In Action Marine, we agree Action Marine applies here. In Action Marine, the Continental Company had internal memos and knowledge that they were intending to pollute the neighborhood. There is no evidence in this case whatsoever that homeward residential intended to cause severe emotional distress to Mrs. McGinnis. There is a lot of evidence that the escrow balance was wrong, even though they did redo it and almost corrected it entirely. There's also evidence the wrongful foreclosure occurred. But where's the evidence that homeward residential intended to cause severe emotional distress to Mrs. McGinnis? They did not. There's nothing in the record. The Action Marine case is right on point. So are other cases in the Georgia law where you've got to specifically intend to cause that harm, not just that your wrongful act was so bad. And so it's a dichotomy between act and the harm. And that's where we believe Judge Royal in the second opinion said from all these wrongful acts, you can infer . . . You're basically arguing that punitive damages shouldn't have been awarded at all. 250, we believe, was awarded and properly awarded, Judge. We believe there's a different standard between specific intent to harm and punitive damages. And specific intent to harm means you had to specifically intend to cause that damage. And that's what the policy in Georgia has said. We have a cap of $250,000 and to exceed that cap, you have to specifically intend to cause that harm, not just that your actions are knowing and wrongful. Also, I guess one point I didn't raise that I wanted to raise, there was $6,000 of emotional distress. But under Georgia law, if the award is only emotional distress, you can't award punitives. There was some . . . and we're not saying punitives are wrong here because there was some emotional distress, $6,000. But we believe that Georgia policy should be relevant when you're considering whether to lower the punitives or not. Georgia law has already spoken that emotional distress damages should not . . . either not be considered or should be discounted when you're considering punitives. Again, the record is what it is and we're not disputing it. But $3 million, given the facts of this case, with a $506,000 compensatory award, we believe is excessive under State Farm and we believe it's excessive under the Georgia statute for specific intent to harm. Thank you. Thank you. Thank you. Next case, Wilcox v.